NOT DESIGNATED FOR PUBLICATION

No. 123,755

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.G.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Reno District Court; PATRICIA MACKE DICK, judge. Opinion filed January 14, 2022.
Affirmed.

*Thomas A. Dower*, of Gilliland Green LLC, of Hutchinson, for appellant natural mother.

*Jennifer L. Harper*, assistant district attorney, and *Thomas R. Stanton*, district attorney, attorney general, for appellee.

Before SCHROEDER, P.J., BRUNS and WARNER, JJ.

PER CURIAM: This is a child in need of care (CINC) case that a panel of this court previously remanded to the district court. The panel remanded this matter with directions for the district court to set a rehearing on disposition and to provide the requisite notice of that hearing to all parties as set forth in K.S.A. 2020 Supp. 38-2254. *In re L.G.*, No. 121,639, 2020 WL 1492859, at *10 (Kan. App. 2020) (unpublished opinion). On remand, the district court held an evidentiary hearing in accordance with the mandate of this court and found that it was in the minor child's best interest to remain in his Father's custody. In this appeal, Mother contends that the district court erred by applying an incorrect standard. In addition, Mother contends that the evidence was insufficient to support the district court's custody order. Finding no error, we affirm the district court's decision.

1

The underlying facts were set forth in the case *In re L.G.*, No. 121,639, 2020 WL 1492859, at *2-7 (Kan. App. 2020) (unpublished opinion). As such, we will focus on the facts that are material to the issue presented in this appeal. If necessary, we will address additional facts in the Analysis section of this opinion.

L.G. was born in June 2015, in Mesa, Arizona. L.G.'s Mother signed an acknowledgment of Father's paternity at the hospital. About two months after L.G. was born, Father filed a paternity action in the Superior Court of Arizona in Maricopa County. In his petition, Father alleged he was the natural father of L.G. However, in response to the petition, Mother's boyfriend, N.D., filed a voluntary acknowledgement of paternity. Subsequently, Mother and N.D. moved to Kansas with L.G. and began calling him by a different name.

On January 11, 2016, Mother filed a verified petition in Kansas to determine paternity, custody, visitation, and support. In the petition, Mother alleged that she was married to N.D. at the time of L.G.'s conception and birth. She also alleged that N.D. was both the natural and presumed father of L.G., even though she knew that this was not true.

On February 22, 2016, Father filed a motion to intervene in the Kansas action for the limited purpose of asking the district court to defer to an order for genetic testing entered in Arizona. He also asked the district court to enforce any orders issued in Arizona regarding L.G.'s paternity. On March 11, 2015, the district court entered an agreed upon order to intervene. In the agreed order, the parties acknowledged that a DNA test performed on March 9, 2016, shows the probability of Father's paternity to be 99.999999997 percent. Based on the DNA paternity test results, Father was allowed to intervene and participate in the case.

2

Father then moved to dismiss the Kansas paternity case on the basis that proceedings regarding custody, visitation, and support were ongoing in Arizona. Mother opposed the motion for dismissal and asked the district court to participate in a conference call with the judge handling the Arizona action to discuss jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). The district court granted Mother's request and a UCCJEA conference was held on April 28, 2016. During the conference, both the Kansas and Arizona courts determined that Arizona was the home state. Nevertheless, it was determined that the Kansas court was the more appropriate forum to decide the issues in this matter because L.G. was living here.

On June 20, 2016, the Arizona court found that the genetic testing results concluded that N.D. is not the natural father of L.G. The following year, Mother filed a petition seeking an order of protection from abuse (PFA) against N.D. In support of her petition, Mother alleged that N.D. sexually assaulted her. On June 6, 2017, the district court issued a final order of protection from abuse. Thereafter, there was significant litigation between N.D. and Mother that is not material to the issues presented in this appeal.

On October 10, 2018, the State filed a petition alleging that L.G. was a child in need of care. In its petition, the State alleged that L.G. was: (1) without adequate parental care, control or subsistence and it is not due solely to the lack of financial means of the child's parents or other custodian (K.S.A. 38-2202[d][1]); and (2) without the care or control necessary for the child's physical, mental or emotional health (K.S.A. 38-2202[d][2]). Specifically, the State alleged the following facts in support of its petition:

"In Reno County case # 18 DM 493, both [Mother] and [N.D.] asserted in the
Petition filed 7-3-18 that they were the parents of [L.G.]. This is contrary to the findings
of the Superior Court of Arizona in Maricopa County case # FC 2015-095221. It found in
its Order filed 6-22-16 that [N.D.] was not the father of [L.G.], setting aside a prior Order

issued in AZ case FC 2015-095415, and changed the child's name back from [E.D.] to [L.G.].

"In 18 DM 493, [N.D.] has been given temporary residential custody of [L.G.] despite having no legal relationship with the child, to the exclusion of the biological [Father]. Based on the allegations against [Mother] which prompted the change in custody, she is not fit. Her actions in changing states and preventing a relationship with the biological father necessitate a closer examination of what is in the best interest at this point in [L.G.]'s life now that he is over three years old and would likely only recognize [N.D.] as his father, and respond to [E.D.], rather than his legal name of [L.G.]."

The court also appointed a guardian ad litem to represent L.G.'s interests, and a pretrial conference was held on October 30, 2018. After hearing from the parties and listening to the arguments of counsel, the district court ordered the case to be supervised by the Kansas Department of Children and Families (DCF). However, the district court left L.G. in the temporary physical custody of N.D. The district court also allowed Father to have two in-person visits with L.G. before he returned home to Arizona. In addition, the district court appointed counsel to represent Mother and continued the pretrial conference.

On November 9, 2018, the district court resumed the pretrial conference and Mother appeared in person as well as through her attorney. Although Mother denied the allegations in the CINC petition, the district court determined that its prior orders should remain in place. The district court also ordered that Father's home in Arizona be assessed under the Interstate Compact for the Placement of Children (ICPC) and that a regular parenting time schedule between L.G. and Father be established using virtual technology. Finally, the district court ordered that an early education screening of L.G. be conducted.

On December 11, 2018, Father filed a motion requesting: (1) an out-of-state overnight visit from January 5, 2019, through January 12, 2019; and (2) immediate placement of L.G. with him in Arizona. Two days later, the parties convened for an

4

evidentiary hearing regarding the allegations in the amended CINC petition. Neither Mother nor Father contested the allegations set forth in the petition, and the district court adjudicated L.G. to be a CINC. Specifically, the district court found that L.G. was without adequate parental care, control, or subsistence. The district court then addressed disposition and temporarily placed L.G. in the legal custody of DCF. The district court also granted Father's request for an out-of-state visit from January 5, 2019, through January 12, 2019. Although the district court did not rule on Father's request for immediate placement of L.G. with him, it ordered N.D. to facilitate virtual visits between L.G. and his Father.

On December 27, 2018, DCF held a case planning conference in which both Mother and Father participated by telephone. About a month later, Father filed a motion asking the district court for an order placing L.G. with him in Arizona. He also requested another out-of-state visit with L.G. Even though the district court granted Father's request for another visit in Arizona, it did not rule on his request that L.G. be placed immediately with him.

Two days before L.G. was scheduled to return to Kansas, the district court issued a two-page "Order Regarding Custody" granting Father custody of L.G. with any future disputes between the parents to be resolved in the Arizona court. On April 4, 2019, Mother filed a motion challenging the district court's legal authority to enter the order modifying custody. In an order entered on June 20, 2019, the district court clarified that its order was not issued sua sponte, but instead was intended to grant Father's motion for direct placement of L.G. with him in Arizona. The district court explained that it had previously taken Father's motion under advisement at a hearing attended by Mother and her attorney. In addition, the district court ruled that the best interests of L.G. are served by placing him with his Father. Thereafter, Mother filed her first appeal.

A panel of this court reversed the court's decision and remanded the matter to the district court for further consideration. In reaching this conclusion, the panel held:

"Upon review of the record, we find no evidence that Mother received notice and an opportunity to be heard at a dispositional hearing on the issue of transferring legal custody of L.G. from DCF in Kansas to Father in Arizona. This is not to say that the district court did not have the authority to enter such an order; Father is L.G.'s natural parent. But before entering the order, [Kansas law] requires the constitutional safeguards of notice and an opportunity to be heard. For this reason, we reverse the court's decision to deny Mother's motion to reconsider and remand with directions for the court to schedule a rehearing on disposition hearing as contemplated by K.S.A. 2019 Supp. 38-2256 and to provide the requisite notice for that hearing to all necessary parties as set forth in K.S.A. 2019 Supp. 38-2254." 2020 WL 1492859, at *9-10.

On remand, the district court scheduled an evidentiary hearing and gave notice to the parties. Unfortunately, the audio recording equipment used at the hearing failed, and a transcript is not available to this court. However, a statement reconstructing the hearing record has been filed pursuant to Kansas Supreme Court Rule 3.04 (2021 Kan. S. Ct. R. 24). This statement was agreed to by the parties and approved by the district court.

The Rule 3.04 statement provides:

"On December 10, 2020, the Court conducted an evidentiary hearing relating to the issues of custody as directed by the Court of Appeals. The following persons testified on that date: the mother; the father by telephone; Tresny Janzen, Director of Rockin J's Child Care—L.G. former daycare provider while residing in Hutchinson, KS; and Shirley Muncie, a LCSW."

- "Ms. Janzen testimony was that L.G. appeared to be well cared for and loved and that he had a strong connection/relationship with his sister who was also present at the daycare."

- "Ms. Muncie testified that she provided counseling services for L.G. ['s] older sister. L.G. was not a patient of hers and she did not offer any expert opinions regarding L.G. Ms. Muncie did testify that frequently during her sessions with L.G.'s older sister that he was present and the close bond and connection between L.G. and his older sister was readily apparent."

- "The mother testified as follows:

  "i. L.G. had resided with her from his birth until the temporary order entered on August 27, 2018.
  "ii. The mother left Arizona, where L.G. was born, in an effort to place distance between herself and the child's father due to his volatile behavior.
  "iii. In late July/early August 2018 mother re-located from Hutchinson, Kansas to Kansas City, Kansas.
  "iv. She complied with the temporary order obtained by an older child's father which resulted in both L.G. and his older sister residing with the older sister's father.
  "v. L.G. and his older sister are extremely close.
  "vi. The mother elected to return to live and work in the Hutchinson, Kansas area and completed the move in October 2018.
  "vii. The case workers assigned to the case had no objections to her household.
  "viii. The mother has 4 children. The oldest resides with his father in Arizona. She has primary custody of her oldest daughter. She has a shared custody arrangement of her youngest daughter.
  "ix. The mother has had minimal difficulty in arranging for parenting time or sharing parenting responsibilities with her other children's fathers.
  "x. The mother has had extreme difficulty in arranging any meaningful contact with L.G. during the time the child has been in Arizona.
  "xi. L.G.'s father has frequently bullied or belittled her and refused to cooperate with phone calls or video conferencing visits.
  "xii. The father has suggested that she 'give up' and allow his significant other to adopt L.G.
  "xiii. This behavior continued when the mother attempted to use text messaging to schedule a FaceTime visit with L.G."

- "The father testified as follows:

    "i. The mother consistently interfered with his ability to have a relationship with L.G.

    "ii. The mother altered and/or changed records at the hospital where L.G. was born to prevent him from having access to L.G.

    "iii. The mother and L.G. left the hospital without any notice to father.

    "iv. Although he was aware she moved to Kansas he wasn't always certain about her exact address.

    "v. Legal actions were commenced in Arizona to address the issue of paternity. That resulted in the Arizona courts finding that he was L.G.['s] father.

    "vi. The mother refused to cooperate with any efforts for him to see his child.

    "vii. The father did not pursue an order of visitation in the paternity case that was pending in Reno County, Kansas due to finances.

    "viii. That the father has sufficient financial resources to provide for the parties' child.

    "ix. The father acknowledged some of the belittling text messages but attributes those to the ongoing frustration over past issues.

    "x. The parties' child has made a good adjustment to Arizona and is currently enrolled in school in Arizona."

After hearing the testimony of the parties and reviewing the evidence, the district court filed a journal entry on December 18, 2020, awarding custody to Father. In the journal entry, the district court found "that it is in the child's best interest to remain in the custody of the father, and to have parenting time with the mother as set forth in the Order Regarding Holiday Parenting Time and Skype visits filed on December 17, 2020." Following the filing of the journal entry, Mother timely filed the present appeal.

ANALYSIS

Mother first contends that the district court erred by applying an incorrect standard in ruling on L.G.'s custody. Although she argues that the district court applied the wrong standard, Mother does not explain why she believes the standard used was wrong nor does she explain what standard she believes should apply. Based on our review of the

8

record, it is clear that the district court used a "best interests" of the child standard in determining L.G.'s custody.

The State argues that since Mother fails to explain or support her argument that the district court applied the wrong standard, this issue is deemed waived and abandoned. In Kansas, a point raised incidentally in a brief and not argued is deemed abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017); see *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). In addition, failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Here, because Mother fails to explain how the district court erred in applying the best interests standard and fails to explain what alternative standard should apply, we find this issue to be waived or abandoned.

We pause to note that even if Mother had explained her argument, the result would be the same. It is important to recognize that this is a CINC action brought under the Revised Kansas Code for Care of Children, which takes precedence over the Kansas Family Law Code. K.S.A. 2020 Supp. 38-2201(a). Absent certain exceptions not applicable to this appeal, jurisdiction continues until the child turns 18 years of age pursuant to the Revised Code for Care of Children unless the child is adopted or is discharged by the court. K.S.A. 2020 Supp. 38-2203(c). As a result, the Revised Code for the Care of Children applies to custody determinations in this CINC action.

Following an adjudication that a child is a CINC, the district court is required to consider the best interests of the child when making dispositional decisions regarding placement and custody. See K.S.A. 2020 Supp. 38-2252(a); K.S.A. 2020 Supp. 38-2253; K.S.A. 2020 Supp. 38-2255. As our Supreme Court has explained, the best interests of the child test has long been the preferred standard to apply when custody of a minor child

9

is at issue between the child's natural parents. *In re Guardianship of B.H.*, 309 Kan. 1097, 1104, 442 P.3d 457 (2019); see also *In re P.J.*, 56 Kan. App. 2d 461, 465, 430 P.3d 988 (2018) (best interests standard applies in CINC proceedings). Further, in remanding this matter to the district court, the panel specifically instructed the district court to hold a hearing "as contemplated by K.S.A. 2019 Supp. 38-2256" and "enter any dispositional orders authorized by the Code." *In re L.G.*, 2020 WL 1492859, at *10. Accordingly, even if Mother had preserved her argument on appeal, a review of the record reveals that the district court correctly applied the best interests standard in determining L.G.'s custody in this CINC action.

Next, Mother contends that the district court's order of custody is not supported by sufficient evidence. As discussed above, the hearing conducted by the district court was to determine the disposition of a CINC action. As such, the district court could appropriately take into consideration any relevant information from the intake and assessment process as well as evidence received at the dispositional hearing. See K.S.A. 2020 Supp. 38-2255(a).

Under K.S.A. 2020 Supp. 38-2255(b):

"The court may place the child in the custody of either of the child's parents subject to terms and conditions which the court prescribes to assure the proper care and protection of the child, including, but not limited to:

"(1) Supervision of the child and the parent by a court services officer;
"(2) participation by the child and the parent in available programs operated by an appropriate individual or agency; and
"(3) any special treatment or care which the child needs for the child's physical, mental or emotional health and safety."

Generally, we review a district court's decision regarding a child's best interests for an abuse of discretion. See *In re P.J.*, 56 Kan. App. 2d at 465; *In re R.S.*, 50 Kan. App. 2d

1105, 1115-16, 336 P.3d 903 (2014). In fact, a determination of the best interests of a child is viewed as being highly discretionary based on the evidence presented in the case. See *In re P.J.*, 56 Kan. App. 2d at 465. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error of fact. The party asserting an abuse of discretion—in this case Mother—bears the burden of showing it. *In re S.R.C.-Q.*, 52 Kan. App. 2d 454, 464, 367 P.3d 1276 (2016).

On appeal, we are not to reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008); *In re D.H.*, 57 Kan. App. 2d 421, 430, 453 P.3d 870 (2019). Here, Mother does not persuasively argue that the district court's journal entry is not supported by substantial competent evidence. Rather, we find that the record contains adequate evidence to support the district court's legal conclusion "that it is in the child's best interest to remain in the custody of the father, and to have parenting time with the mother . . . ."

Mother essentially asks us to reweigh the evidence, pointing to the following: (1) Father was not involved in L.G.'s life prior to the filing of the CINC case; (2) L.G. had a good relationship with his siblings in Kansas; (3) Mother claims that Father was abusive to her; and (4) Mother and Father do not get along. However, there is evidence in the record that Mother played a role in preventing Father from seeing or developing a relationship with L.G. Specifically, the evidence shows that Mother removed L.G. from Arizona without Father's knowledge; that her actions prevented L.G. from having "a relationship with his biological father;" that Mother continued to represent that N.D. was L.G.'s natural father despite a paternity test to the contrary; that N.D.—although not L.G.'s father—received temporary custody of L.G. based on allegations that Mother was "not a proper placement" for the child; that Mother changed L.G.'s name in order to represent him as N.D.'s son; and that Mother refused to maintain contact with Father

11

despite the fact that he tried to reach her through social media, family members, and through court filings.

During the CINC hearing, Father informed the court that he had spent $15,000 in expenses in trying to establish paternity and gain access to his son. Moreover, Father stated that despite the district court ordering virtual visits with L.G., he was not consistently allowed to do so. But once Saint Francis Ministries—which was a 3rd party contractor of DCF—began to facilitate the virtual visits, they occurred on a regular basis and without any concerns being expressed.

Our review of the record confirms that substantial competent evidence supports the district court's decision that it was in L.G.'s best interests to be placed in the custody of Father. It is undisputed that Mother attempted to keep L.G. from his Father, even after paternity was confirmed by genetic testing. After the filing of a CINC petition in October 2018, L.G. was placed in the temporary physical custody of N.D., despite the fact that N.D. had no legal relationship with the child. Since being subsequently placed in Father's custody, the record confirms that L.G. has adjusted well. Father testified that L.G. was currently enrolled in school with an IEP in place to meet his educational needs. Further, L.G. has a little sister in Arizona, and Father testified that L.G. was happy in his household. In addition, L.G. spends time with extended family, including cousins close to his age. As to his relationships in Kansas, Father testified that L.G. was able to see his siblings on a visit to Kansas during his Mother's parenting time.

Although child custody decisions are difficult, we conclude that there is substantial competent evidence in the record to support the district court's determination that it is in the best interests of L.G. to remain in the custody of his Father. Furthermore, we conclude that the district court's decision is reasonable and supported by the evidence. We also conclude that the district court did not error as a matter of law. We, therefore,

12

affirm the district court's journal entry granting custody of L.G. to his Father and granting his Mother reasonable parenting time.

Affirmed.